**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**PENDLETON DIVISION**

CONNIE SMITH,

        Plaintiff,

vs.

PATHOLOGY ASSOCIATES MEDICAL
LABORATORIES, LLC,
a foreign corporation,

        Defendant.

_____

No. 10-CV-126-HU

**FINDINGS AND RECOMMENDATIONS**
**ON DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT**

Attorney for Plaintiff:
Aaron W. Baker
650 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204

Attorneys for Defendant:
Howard Rubin
Jennifer a. Nelson
Littler Mendelson, P.C.
121 SW Morrison, Suite 900
Portland, OR 97204

1 - FINDINGS AND RECOMMENDATIONS

1  HUBEL, United States Magistrate Judge

2      The plaintiff Connie Smith brings this diversity action
3  against her former employer Pathology Associates Medical
4  Laboratories, LLC ("PAML"), asserting claims for age-discriminatory
5  hostile work environment and retaliation in violation of Oregon
6  Revised Statutes section 659A.030. Smith claims she was subjected
7  to age-based discrimination throughout her two-month employment
8  with PAML which created a hostile work environment, and she
9  suffered retaliation for reporting the discrimination. The matter
10 is before the court on PAML's motion for summary judgment. The
11 undersigned submits these proposed findings of fact and
12 recommendations for disposition of the motion pursuant to 28 U.S.C.
13 § 636(b)(1)(B).

14

15                        ***BACKGROUND FACTS***

16     On February 19, 2008, Smith began working for PAML as a
17 Clinical Laboratory Assistant at the company's laboratory in
18 Hermiston, Oregon. Another Clinical Laboratory Assistant, Jennifer
19 McFarlane, also worked at the Hermiston laboratory. Smith's and
20 McFarlane's direct supervisor was Eric Williams, who worked at
21 PAML's Walla Walla, Washington, laboratory. Williams visited the
22 Hermiston clinic at least once a month, and was responsible for
23 overseeing both the Hermiston and Walla Walla laboratories. In the
24 beginning, Smith thought McFarlane also had some supervisory
25 authority over her, but she later learned from Williams that this
26 was not the case; they were simply co-workers. Pl. Depo. at 23.

27     Although Smith and McFarlane were the only two PAML employees
28 at the Hermiston laboratory, the laboratory is located in the

2 - FINDINGS AND RECOMMENDATIONS

Yakima Valley Farm Workers Clinic, which is staffed by approximately thirty-five employees. Smith and McFarlane worked in close proximity to and interacted daily with the clinic employees. Troyer Decl. ¶ 3.

PAML has a policy prohibiting harassment in the workplace. Smith was aware of the policy, and understood that she should report any kind of harassing behavior promptly, and PAML would investigate and address the problem. She also understood that PAML had an open-door policy that encouraged employees to bring their complaints to management. Pl. Depo. at 10-12.

At the start of Smith's employment, she received some training in Hermiston by Williams. Pl. Depo. at 15-16. Smith alleges McFarlane refused to provide her with any additional training, and when she would ask McFarlane questions, McFarlane ridiculed and belittled her, suggesting Smith was unable to "get it" due to her age, telling Smith she was unable to multi-task, suggesting Smith's eyesight was not as good as it used to be due to her age, and stating "old people [were] a waste of air." Pl. Depo. at 28-29, 53. Smith claims that from her first day on the job, she was subjected to daily age-based harassment by McFarlane. She estimates she was subjected to at least fifty age-related comments from McFarlane during her two-month tenure at PAML. Pl. Depo. at 29. She claims she complained to Williams almost daily about the harassment. Pl. Dep. at 27. She further claims Williams told her, on her first day of work, "that they knew they were going to have an issue with [McFarlane], because . . . she was really attached to the gal that worked there before, that she was pretty territorial about her lab and that she wasn't too happy about

3 - FINDINGS AND RECOMMENDATIONS

having somebody hired . . . [a]nd that she wanted somebody close to her age." Pl. Depo. at 39-40. According to Smith, McFarlane also made age-related comments about others in the workplace, including Certified Nursing Assistants at the clinic, and in particular "a courier, an older gentleman that would come in and pick up [their] samples." Pl. Depo. at 125.

On March 3, 2008, Smith went to Spokane, Washington, for an orientation. While she was in Spokane, Smith told PAML's Chief Compliance Officer Marguerite Busch that she was concerned about her lack of training in Hermiston. According to Smith, Busch responded, "I will take care of it." Pl. Depo. at 18. A short time later, while Smith was on a tour of the Spokane facility, Enterprise Service Manager Cathey Smalley drew her aside and asked for more details. Smith told Smalley that she "wasn't getting very much training down there, that [McFarlane] was unwilling to train [her] at all, and that [she] had talked to [Williams] about that." *Id.* Smith continued to feel she needed more training than she was getting, and Smalley indicated "she would take care of that." *Id.* In addition, Smith told Smalley that McFarlane "had made some comments about . . . [her] being too old to retain things." *Id.* Smalley set up additional training for Smith with Patient Service Center Assistant Supervisor Carol Richey and Clinical laboratory Technician Lorna Wise. Pl. Depo. at 19; Smalley Depo. at 6-7. However, according to Smith, when she returned to the Hermiston lab, McFarlane told her, "What they do up there is the way they do it. And how I do it here in my lab is how I do it. And you go by what I do in my lab." Pl. Depo. at 32. Smith stated McFarlane

4 - FINDINGS AND RECOMMENDATIONS

ridiculed her every time she used the training she had received from Richey. Pl. Depo. at 31, 32.

On March 10, 2008, not quite a month into Smith's employment, Patient Service Center Manager Matthew Swanson met with Smith and McFarlane, separately, in Hermiston. Swanson took McFarlane to lunch, and when they returned, he and Williams met with Smith. Smith did not feel Swanson took her complaints seriously because Swanson stated "the allegations . . . did not sound like [McFarlane], that he had known her and that she didn't . . . that is not the story that he had gotten from her." Pl. Depo. at 34. In addition, the meeting with Smith was held in a room in which employees of the clinic were eating lunch. After about twenty minutes, Smith told Swanson she felt uncomfortable discussing the matter with the clinic employees present, and he asked the others to leave the room. Pl. Depo. at 35-36. At some point, either that day or on a later telephone call, Swanson directed Smith to document her problems with McFarlane in a letter. Pl. Depo. at 36. Smith understood that the letter would be used to investigate her complaints further. Pl. Depo. at 43. A couple of days later, Smith responded to an inquiry from Richey that things were going a little better and she thought everything would work out. Pl. Depo. at 44.

Smith had a follow-up call with Swanson sometime between March 10 and 23, 2008, and on March 3rd, she provided Swanson with a seven-page, typewritten letter detailing her concerns. She did not include every incident of harassment she believed had occurred since the inception of her employment, but instead tried "to just kind of pinpoint the major things that were going on[.]" Pl. Depo.

5 - FINDINGS AND RECOMMENDATIONS

1  at 47.  In her deposition, she acknowledged that the letter
2  mentioned only one age-related comment by McFarlane, but she
3  testified she did not include all of McFarlane's age-related
4  comments because she had reported her concerns verbally to PAML
5  management by phone numerous times, and she did not feel it was
6  necessary to repeat them again in the letter.  Pl. Depo. at 49-50.
7  She also had voiced her concerns to a nursing supervisor at the
8  clinic in which the laboratory was housed.  Pl. Depo. at 54.  She
9  further testified that "things got worse with [McFarlane] after
10 March 23, 2008, the date of the letter.  Pl. Depo. at 47.

11     Smith went to Walla Walla for a week of training from March
12 24th to March 28th.  In her deposition, Smith testified she felt
13 she received the training she needed in Walla Walla, and she was
14 satisfied with PAML's response to her concerns about her training
15 needs.  Pl. Depo. at 50-51.  On March 27, 2008, she had a
16 conference call with Swanson and Williams to discuss the concerns
17 raised in her letter.  Smith stated she thought McFarlane "was
18 sabotaging [her] job," and according to Smith, Swanson "said that
19 he would not let that happen."  Pl. Depo. at 58.  It was her
20 understanding from the conversation that Swanson was going to
21 investigate her allegations, and she felt her concerns were being
22 addressed appropriately at that point.  *Id.*

23     On April 1, 2008, Swanson had a conference call with Williams
24 and McFarlane to discuss Smith's complaints.  *See* Swanson Decl. ¶
25 7 & Ex. E.   Swanson grouped Smith's complaints together and
26 summarized her different areas of concern.  Smith testified that
27 Swanson's grouping of her concerns was a fair representation of the
28 different complaints she had made in her letter.  Pl. Depo. at 60.

6 - FINDINGS AND RECOMMENDATIONS

1   During the meeting, McFarlane admitted she sometimes was quiet
2   around Smith, "[a]fraid that the next sentence [would] set her
3   off." Swanson Decl. Ex. E. McFarlane indicated she had to repeat
4   instructions to Smith frequently, and she admitted she had been
5   frustrated with Smith, "not treating her like she is stupid but
6   [telling] her to look up test requirements in the PAML test
7   directory online." *Id.* McFarlane denied "slamming" things around,
8   like chairs, and she denied making age-related comments to Smith.
9   *Id.* Swanson told McFarlane to focus on the patients/clients, and
10  to bring Smith's errors to Williams's attention so he could follow
11  up on them, rather than having McFarlane correct Smith herself.
12  *Id.* In her deposition, Smith testified that she believed Swanson's
13  instructions to McFarlane were appropriate. Pl. Depo. at 66.
14  Williams also conducted his own investigation of the concerns Smith
15  had raised in her letter, and he prepared a summary of his
16  investigation. *See* Swanson Decl., Ex. A.

17      Smith did not consider her March 23rd letter to be a formal
18  complaint. She knew her concerns were being investigated, but she
19  was unsure whether PAML's human resources department had seen the
20  letter. As a result, and at the urging of one of the clinic's
21  employees, Smith spoke on April 14, 2008, with Kimberly Troyer, the
22  PAML Human Resources Director, about her problems with McFarlane.
23  Smith told Troyer that McFarlane had been verbally abusive to her
24  from her first day on the job, and had made age-related comments to
25  her. She told Troyer that Williams had stated the problem was just
26  a personality conflict, and had told Smith, "[M]aybe you should
27  quit and look for another job." Pl. Depo. at 67-70. Troyer stated
28  she would investigate Smith's complaints. Pl. Depo. at 71.

7 - FINDINGS AND RECOMMENDATIONS

1   On April 17, 2008, Williams and Swanson gave Troyer the
2   results of their investigations of Smith's complaints. Troyer
3   Decl. ¶ 7. Troyer and Smalley met with Williams and Swanson the
4   same day to discuss the results of the investigation. They
5   "decided that a personality conflict existed between [Smith] and
6   Ms. McFarlane that clearly needed to be addressed, but that there
7   was no evidence of discrimination or harassment." *Id.* ¶ 8. Troyer
8   prepared two identical letter agreements for Smith and McFarlane,
9   addressing the results of the investigation. Among other things,
10  the letter agreements directed the women to treat each other with
11  courtesy, and to behave professionally. They were advised that any
12  inappropriate behavior could lead to disciplinary action. Troyer,
13  Smalley, Swanson, and Williams met separately with Smith and
14  McFarlane on April 23, 2008, to provide them with the agreements.
15  Both women signed the letter agreement. *Id.* & Ex. B. Smith
16  acknowledged that these actions were an appropriate response to her
17  complaints. Pl. Depo. at 86.

18      Smith returned to work on Thursday, April 24, 2008. She
19  testified that McFarlane was "really angry" that day, "slamming
20  things around [and] her body language." Pl. Depo. at 89.
21  According to Smith, she asked McFarlane a question, McFarlane
22  explicitly refused to help her, Smith got upset and said she "can't
23  take this no more," and McFarlane responded, "Then you need to get
24  the f**k out because I don't want you here and nobody wants you
25  here, so just leave." *Id.* Smith testified she told Williams and
26  Swanson about this encounter, and Williams said he was tired of
27  hearing about the conflict and Smith and McFarlane just needed to
28  work things out. Pl. Depo. at 90. She also left a message for

8 - FINDINGS AND RECOMMENDATIONS

1 Troyer.  When Troyer returned her call, Smith stated that things
2 with McFarlane had gotten worse since they received the letter
3 agreement.  Pl. Depo. at 94.  Smith also told Swanson she was
4 afraid McFarlane "might even hit [her]," noting McFarlane had said
5 on one occasion that "she worked out and stuff and that she could
6 knock somebody's head off, that she lifted weights."  *Id.* at 77.
7 According to Smith, McFarlane suggested that whether or not she
8 "would knock [Smith's] head off" depended on how much Smith
9 "provoked her."  *Id.*

10    Smith continued to have problems with McFarlane throughout the
11 day on April 24th.  She stayed home on Friday, April 25th, and then
12 resigned on Monday, April 28th, about ten days shy of her three-
13 month employment anniversary.  Pl. Depo. at 95-100; Troyer Decl.
14 ¶ 10.  Smith testified she felt Swanson and Williams were not going
15 to support her and "there was no other way to stay" on the job. Pl.
16 Depo. at 101.  She felt McFarlane was not going to change her
17 behavior, and "it was unbearable" to work with her.  Pl. Depo. at
18 102-03.  Both Williams and Swanson suggested to Smith that her best
19 option was to quit.  *Id.* at 79; Swanson Depo. at 40.

20    In McFarlane's deposition, she admitted she can have a "hot
21 temper, and she had smashed into the cupboards once.  McFarlane
22 Depo. at 28, 44.  She testified she told Smith on one occasion that
23 "[e]xcuses are like assholes, everybody has one."  *Id.* at 22.  She
24 stated the remark was in response to Smith's "excuse of why she was
25 doing [something] wrong."  *Id.*  She further testified she did not
26 consider that to be an appropriate workplace comment, and she
27 considers "asshole" to be a curse word.  *Id.* at 22-23.  She also
28 admitted to telling Smith, on another occasion, that she felt "like

9 - FINDINGS AND RECOMMENDATIONS

a f\*\*king monkey in a cage where people throw sh\*\* at the window,"
stating she only used that type of language with people she knew
"would not be offended." *Id.* at 28-29.

### *SUMMARY JUDGMENT STANDARDS*

Summary judgment "should be rendered if the pleadings, the
discovery and disclosure materials on file, and any affidavits show
that there is no genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(c)(2). In considering a motion for summary judgment, the
court "must not weigh the evidence or determine the truth of the
matter but only determine whether there is a genuine issue for
trial." *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th
Cir. 2002) (citing *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d
407, 410 (9th Cir. 1996)).

The Ninth Circuit Court of Appeals has described "the shifting
burden of proof governing motions for summary judgment" as follows:

> The moving party initially bears the burden of
> proving the absence of a genuine issue of
> material fact. *Celotex Corp. v. Catrett*, 477
> U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d
> 265 (1986). Where the non-moving party bears
> the burden of proof at trial, the moving party
> need only prove that there is an absence of
> evidence to support the non-moving party's
> case. *Id.* at 325, 106 S. Ct. 2548. Where the
> moving party meets that burden, the burden
> then shifts to the non-moving party to
> designate specific facts demonstrating the
> existence of genuine issues for trial. *Id.* at
> 324, 106 S. Ct. 2548. This burden is not a
> light one. The non-moving party must show
> more than the mere existence of a scintilla of
> evidence. *Anderson v. Liberty Lobby, Inc.*,
> 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed.
> 2d 202 (1986). The non-moving party must do
> more than show there is some "metaphysical
> doubt" as to the material facts at issue.

> *Matsushita Elec. Indus. Co., Ltd. v. Zenith*
> *Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct.
> 1348, 89 L. Ed. 2d 528 (1986).  In fact, the
> non-moving party must come forth with evidence
> from which a jury could reasonably render a
> verdict in the non-moving party's favor.
> *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505.
> In determining whether a jury could reasonably
> render a verdict in the non-moving party's
> favor, all justifiable inferences are to be
> drawn in its favor.  *Id.* at 255, 106 S. Ct.
> 2505.

*In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010).  Notably, "[a]s a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. Univ. of Calif. Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000).  The *Chuang* court explained that this minimal evidence standard is due to the nature of employment cases, where "'the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by a factfinder, upon a full record.'"  *Id.* (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996)).

Keeping these standards in mind, the court turns to a discussion of PAML's motion for summary judgment.

### *DISCUSSION*

#### A.  *Age Discrimination and Hostile Work Environment Claim*

Smith brings this action under Oregon Revised Statutes section 659A.030, which prohibits an employer from discriminating against an individual in "compensation or in terms, conditions or privileges of employment" on the basis of the "individual's race, color, religion, sex, sexual orientation, national origin, marital

11 - FINDINGS AND RECOMMENDATIONS

status or age." Or. Rev. Stat. § 659A.030(1)(1)(b). Smith claims PAML violated the statute because she was subjected to daily harassment in the form of age-based comments by her coworker McFarlane, resulting in a hostile work environment, and PAML failed to take appropriate action to remedy the situation.

To prevail on her age-based hostile work environment claim, Smith must show that she was subjected to unwelcome verbal or physical conduct based on her age, and "the conduct was 'sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment.'" *Castle v. Orenco Systems, Inc.*, slip op., No. 09-6142-HO, 2010 WL 5067964 at *3 (D. Or. Dec. 3, 2010) (quoting *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003)).

> To survive summary judgment on a hostile work environment claim, a plaintiff must show a genuine factual dispute as to: (1) whether a reasonable person would find the workplace so objectively and subjectively hostile toward [her] as to create an abusive work environment; and (2) whether the defendant failed to take adequate remedial and disciplinary action. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).

*Id.*

The plaintiff "must show that the work environment was *both* subjectively and objectively hostile." *Id.* (citation omitted). As the undersigned explained in *Mendoza v. Wasco County*, slip op. 2010 WL 4641679 (D. Or. Nov. 8, 2010):

> To survive summary judgment on a hostile work environment claim, plaintiff must "establish a pattern of ongoing and persistent harassment severe enough to alter the conditions of employment." *Nichols v. Azteca Restaurant Enters, Inc.*, 256 F.3d 864, 871 (8th Cir. 2001) (internal quotation omitted).

12 - FINDINGS AND RECOMMENDATIONS

The harassment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). . . .

When determining whether a workplace is hostile, the court considers all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Nichols*, 256 F.3d at 872 (internal quotation omitted). However, "no single factor is required," *Harris*, 510 U.S. at 23, and "[t]he required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *Nichols*, 256 F.3d at 872 (internal quotation omitted).

"A working environment is abusive if hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2000) (internal quotation omitted).

*Mendoza*, 2010 WL 4641679 at *10.

In the present case, PAML argues Smith cannot prove either element of her hostile work environment claim. PAML contends McFarlane's allegedly age-related comments were insufficient to establish a hostile work environment, and Smith's other allegations were "nothing other than [Smith] deeming Ms. McFarlane difficult to work with." Dkt. No. 26, pp. 16-17. PAML relies on *Kelleher v. Bank of the West*, 2008 WL 3853367 (D. Or. Aug. 14, 2008), arguing the case is on point here.

13 - FINDINGS AND RECOMMENDATIONS

In *Kelleher*, the plaintiff brought claims for discrimination and retaliation in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; and Oregon Revised Statutes section 659A. The plaintiff claimed, *inter alia*, that her coworkers had "told her that she 'smell[ed] like old pee,' dressed 'old and frumpy,' and was 'too old to wear sleeveless tops because [you] get loose, saggy skin from age.'" *Id.*, 2008 WL 3853367 at *4. She also claimed her coworkers made age-related comments about other employees at the company. The court granted the defendant's motion for summary judgment, holding that although the plaintiff claimed her coworkers' harassment of her was continuous, "only a small portion of the allegedly discriminatory conduct focused on her age," and "the comments as a whole [were] not sufficiently severe or numerous to create an abusive environment." *Id.*, 2008 WL 3853367 at *5. The court "conclude[d] that the ageist comments in the record constitute[d] 'simple teasing' and not illegal harassment." *Id.*

Smith counters that she "has provided ample evidence McFarlane participated in an ongoing deluge of inappropriate verbal and non-verbal actions toward [her] which was swept under the rug by management by calling it a personality conflict." Dkt. No. 37, p. 8. She argues that the determination of whether the workplace was objectively hostile must be "determined from the perspective of a reasonable person with the same fundamental characteristics as Smith." *Id.* (citing *Crowe v. Wiltel Commun. Sys.*, 103 F.3d 897, 900 (9th Cir. 1996)). She further argues that to the extent any of McFarlane's comments could be considered ambiguous, the jury should

14 - FINDINGS AND RECOMMENDATIONS

make the determination as to their meaning, rather than the court, observing that "'so long as ambiguous evidence requires inferences to be made, it is the role of the jury to draw such inferences.'" *Id.* (quoting *United States v. Poehlman*, 217 F.3d 692, 706 (9th Cir. 2000).

In both its brief in chief and its reply brief, PAML argues that even assuming *arguendo* that McFarlane's comments did amount to age-related harassment, Smith has failed to show PAML failed to take appropriate action. Dkt. No. 26, pp. 19-21; Dkt. No. 41, pp, 2-4. PAML asserts it is Smith's burden to prove PAML's response was inadequate, and she has failed to do so. Dkt. No. 41, p. 2 (citations omitted). PAML claims its "investigation of [Smith's] complaints was immediate, extensive, and thorough," consisting of employee interviews, reviews of documents, and internal oversight of the investigation. PAML argues it "specifically investigated [Smith's] allegations of age-based discrimination/harassment, however, they were uncorroborated and unsubstantiated, and PAML is under no legal obligation to give credence to such allegations." *Id.*, p. 3 (citation omitted).

Smith argues her complaints were not taken seriously, were "met with disdain from her immediate supervisor and [she] was actually advised to quit." Dkt. No. 37, p. 10. She cites *Burlington Industries, Inc. v. Ellerth*, 524. U.S. 742, 765, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998), in support of her argument. Neither case is applicable to the present issue. Both *Burlington Industries* and *Faragher* dealt with the ability of a defending employer to raise an

15 - FINDINGS AND RECOMMENDATIONS

1  affirmative defense to the vicarious liability claim of a
2  victimized employee for "an actionable hostile environment created
3  by a supervisor with immediate (or successively higher) authority
4  over the employee." *Id.*

5      On this record, Smith has presented evidence that she was
6  subjected to age-based comments on a daily basis by McFarlane, a
7  co-worker, and that McFarlane failed to assist in her training, and
8  even took actions to undermine her work.  McFarlane disputes these
9  allegations, creating a typical factual conflict.  There is little
10 question that Smith subjectively perceived McFarlane's comments and
11 conduct as hostile and abusive.  The real question on this summary
12 judgment is whether a reasonable jury could find that the
13 environment was objectively hostile and return a verdict in Smith's
14 favor.  In addition, a reasonable jury would have to be able to
15 conclude from the evidence that PAML's response to Smith's
16 complaints was inadequate.

17     The undersigned finds that even if the jury found McFarlane's
18 comments to be discriminatory and the workplace to be hostile,
19 Smith has failed to show PAML's response to her complaints was
20 inappropriate.  Indeed, when asked repeatedly throughout her
21 deposition whether she felt the company's actions were appropriate
22 and she was satisfied with the response of her supervisors, Smith
23 testified in the affirmative.  Although the court is loath to grant
24 summary judgment in an employment case, where "very little
25 evidence" is required "to overcome an employer's motion for summary
26 judgment," *Chuang*, 225 F.3d at 1124, here the record evidence
27 simply does not establish Smith's hostile work environment claim.
28 The undersigned therefore finds that PAML's motion for summary

16 - FINDINGS AND RECOMMENDATIONS

1  judgment should be granted on Smith's hostile work environment
2  claim.

3                    **B.  Retaliation Claim**

4       To establish a *prima facie* case of retaliation, Smith must
5  show that (1) she engaged in a protected activity; (2) PAML
6  subjected her to an adverse employment action; and (3) there was a
7  causal link between Smith's protected activity and PAML's adverse
8  employment action. *Hardage v. CBS Broadcasting, Inc.*, 427 F.3d
9  1177, 1187 (9th Cir. 2005) (citations omitted).

10      Smith argues she engaged in a protected activity when she
11  complained to PAML's management about the harassment.  She claims
12  she was subjected to adverse employment action when PAML provided
13  her with the letter agreement stating further disciplinary action
14  might occur if the problems continued; forced her to continue
15  working with her harraser; made it clear they did not want to hear
16  more complaints; and encouraged her to quit.  She asserts, "The
17  causal link between the protected activity and the adverse
18  employment action may be established by an inference drawn from
19  circumstantial evidence."  Dkt. No. 37, p. 11 (citing *Yartzoff v.*
20  *Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)).  She argues further
21  that "[a]n objectively reasonable juror could without doubt return
22  a verdict for [her] on the retaliation claim with the evidence at
23  hand viewed in a light most favorable to [her]."  *Id.*, p. 12.

24      PAML argues Smith "suffered absolutely no adverse employment
25  action while working for PAML."  Dkt. No. 26, p. 22.  PAML asserts
26  it is particularly significant that Smith "quit without discovering
27  if PAML's remedial actions were going to work."  *Id.*  The
28  undersigned agrees.  On this record, PAML took appropriate and

17 - FINDINGS AND RECOMMENDATIONS

thorough action to address Smith's complaints.  The fact that the company failed to substantiate the complaints, and then issued a written letter agreement advising both Smith and McFarlane that further inappropriate action could be met with disciplinary action, was not retaliatory.  Had Smith asserted a *prima facie* retaliation claim, then the burden would shift to PAML "to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Manatt v. Bank of America, NA*, 339 F.3d 792, 800 (9th Cir. 2003) (citing *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000)).  Here, there is no adverse employment action for which PAML must articulate such a reason.  The undersigned recommends that PAML's motion for summary judgment be granted as to Smith's retaliation claim.

### *CONCLUSION*

The undersigned respectfully recommends that PAML's motion for summary judgment be granted.  These Findings and Recommendation will be referred to a district judge.  Objections, if any, are due by **May 23, 2011**.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.  If objections are filed, then any response is due by **June 9, 2011**.  By the earlier of the response due date or the date a response is filed, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 4th day of May, 2011.

/s/ Dennis J. Hubel

_____
Dennis James Hubel
Unites States Magistrate Judge

18 - FINDINGS AND RECOMMENDATIONS